IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES LOYD, *et al.*, | ) | CASE NO.: 1:08 CV 2301 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| HUNTINGTON NATIONAL BANK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | <u>MEMORANDUM OPINION</u> |
| | ) | <u>AND ORDER</u> |
| | ) | |

This case is before the Court on the Defendants' Motions to Dismiss Plaintiffs' First

Amended Complaint.  The Defendants have filed numerous Motions to Dismiss, some filed

jointly by multiple defendants and some filed on behalf of individual defendants. The

Defendants raise various arguments for the dismissal of Plaintiffs' claims.  Having fully

considered all of the facts and law relevant to the motions, the Court finds as follows.

## PROCEDURAL HISTORY

Plaintiffs filed their original Complaint on September 29, 2008.  (ECF #1).  An Amended Complaint was filed on January 9, 2009.[1]  (ECF #80).  The Defendants have filed a myriad of briefs requesting dismissal of Plaintiffs' claims.  Common to all of the motions to dismiss is the question of whether the claims brought under the Uniform Commercial Code ("UCC") are barred by the applicable statutes of limitation.   Statute of limitations issues have also been raised in connection with the common law claims.  Further, several Defendants have provided substantive arguments as to why Plaintiffs' claims fail to state claims upon which relief may be granted.

Motions to dismiss the Plaintiffs' Amended Complaint remain pending under the following ECF numbers: #84 (Terre Haute Savings); #87 (Old National Bancorp); #89 (Wilson & Muir Bank & Trust Co.); #90 (Springs Valley Bank & Trust);[2] #95 (First Merit Corp.); #96 (U.S. Bank National Association and The Killbuck Savings Bank); #97 (Sunflower Bank); #98 (Fifth Third Bank);[3] #99 (Third Federal Bank); #101 (Walls Fargo Bank); #103 (Dollar Bank); #107 (Charter One Bank); #108 (Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, and Sky Bank); #118 (Century Federal Credit Union); #120 (Huntington National Bank, N.A.); #121 (Sun Trust Bank, N.A.  and Wachovia Bank, N.A.);

---

[1] The Amended Complaint is styled (though not captioned) as a purported class action suit.  Multiple classes have been defined based on which bank negotiated and/or deposited the checks at issue in this case.

[2] Springs Valley Bank & Trust was named in the original Complaint, but was not named in the First Amended Complaint.  It is, therefore, dismissed, for want of prosecution.

[3] This motion was mis-captioned as a Motion to Dismiss Second Amended Class Action Complaint.

2

#124 (Farmers & Merchants Bank of Colby);[4] #136 (First National Bank of Pennsylvania); #137 (Bank of America); and, #156 (German American Bancorp).[5]  Plaintiff also named John Doe Banks one through ten (additional drawee banks) and John Doe Banks eleven through fifteen (additional depository banks) in the caption of the Amended Complaint.

Plaintiffs filed a global Response to Defendants' Motion to Dismiss on April 28, 2009. (ECF #157).[6]  Several Defendants filed replies to the Plaintiffs' Opposition.  (ECF # 166, 168-170, 172-184, 187).  Oral arguments were heard on the motions on May 28, 2009.  The pending motions to dismiss have now been fully briefed and are ready for consideration.

## PARTIES

The Plaintiffs are individuals who, between 1998 and 1999, wrote checks to Serengeti Diamonds U.S.A., Inc. ("Serengeti") and/or Lomas De La Barra ("Lomas"), thinking that they were purchasing promissory notes in those companies.  These "notes" were being sold by James

---

[4] Farmers & Merchants Bank of Colby was identified as "Bank of Colby" in the Amended Complaint.

[5] The Amended Complaint also names "First National Bank" and "First National Bank of Odon" as Defendants.  No responsive pleading has been filed by either entity, and there is no indication on the docket that either of these entities were ever served with a complaint (or that service was even attempted) in this action.  Pursuant to Fed. R. Civ. P. 4(m), if a Defendant has not been served within 120 days of the filing of a Complaint against them, the Court must dismiss the action without prejudice against that Defendant.  Generally a Court will provide prior notice to the Plaintiffs of its intent to dismiss for failure of service.  However, because the claims against these parties would otherwise be dismissed as untimely under the applicable statute of limitations, the Court finds that the interests of the parties and principles of judicial economy dictate that it is more appropriate under these circumstances to dismiss these parties without prejudice.  If Plaintiffs believe that they can properly serve these Defendants and they wish to pursue an action against them, they may file a motion to reinstate the action as against these Defendants only.

[6] Plaintiffs filed their response a day after it was due along with a request for leave to file the response instanter.  The Court granted leave on May 11, 2009.  (ECF non-doc.)

Carpenter directly and/or through agents or brokers.   Mr. Carpenter allegedly failed to use the funds provided by the investors to purchase promissory notes in these companies, and instead "commingled" them into bank accounts he controlled.   Plaintiffs claim they were injured when the Defendant Drawee Banks improperly paid checks "made to Defendant depositary [banks], which had wrongly negotiated the check[s] into an account it opened" in the name of Serengeti and/or Lomas.

There are two main categories of Defendants in this action.  The first are the Drawee Banks.  Drawee Banks are the banks that paid off on the checks written by the Plaintiffs (i.e., the banks at which the Plaintiffs had accounts).  The Drawee Banks are:  Huntington National Bank; Fifth Third (in its own name and as corporate successor by merger to Citizens Bank and The Strongsville Savings Bank); Sun Trust (through merger/acquisition of Firstar Bank and Star Bank); Wachovia Bank (as corporate successor to First United Bank, First United Bancorp and First Union Bank); Bank of America (through merger with Bank of Boston); Bank of Colby; Belmont National Bank; Century Federal Credit Union; Charter One Bank; Dollar Bank; Firstmerit Corporation (in its own name and as corporate successor to Signal Bank); First National Bank; First National Bank of Odon; First National Bank of Pennsylvania; German American Bancorp (as corporate successor to Community Bank); JP Morgan/Chase Bank (as corporate successor to Bank One and First National Bank of Chicago); Key Bank; Killbuck Savings Bank; Old National Bancorp (in its own name and as corporate successor to the Dubois County Bank); PNC Bank (in its own name and as corporate successor to National City Bank); Sky Bank (as corporate successor to Citizens Bank); Sunflower Bank; Third Federal Savings Bank; Terre Haute Savings; US Bank (as corporate successor to Star Bank); Wells Fargo; and,

4

Wilson & Muir Bank. Plaintiffs assert one claim against the drawee banks for violations of the Uniform Commercial Code ("UCC") Section 4-401(Count I ).

The Second group of Defendants are the Depositary Banks. The Depositary Banks are accused of wrongly opening and maintaining bank accounts for James Carpenter in the names of Serengeti and Lomas. The Depositary Banks are: Huntington National Bank (as corporate successor to First National Bank of Zanesville, Bank First National of Zanesville, and Unizan Bank); Fifth Third; Sun Trust; and, Wachovia Bank. Plaintiffs' claims against the Depositary Banks include the following: fraud, fraudulent concealment, and conspiracy to commit fraud (Count II - against Huntington National; Count III - against Fifth Third; Count IV - against Wachovia; and, Count V[7] - against Sun Trust); failure to act with ordinary care (Count VI - against all Depositary Banks); breach of fiduciary duty (Count VII - against all Depositary Banks); money had and received (Count VIII- against all Depositary Banks); and, aiding and abetting Carpenter's tortious acts (Count IX - against all Depositary Banks).

## **STANDARD OF REVIEW**

On a motion brought under Fed. R. Civ. P. 12(b)(6), this Court's inquiry is limited to the content of the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. See Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3rd Cir. 1990).

In evaluating a motion for dismissal under Rule 12(b)(6), the district court must "consider the pleadings and affidavits in a light most favorable to the [non-moving party]." Jones v. City of

---

[7] The Amended Complaint mistakenly labels Count V, as "Count IV." This opinion will refer to the Fraud count against Sun Trust as "Count V."

Carlisle, Ky., 3 F.3d. 945, 947 (6th Cir. 1993) (quoting Welsh v. Gibbs, 631 F.2d 436, 439 (6th Cir. 1980)). However, though construing the complaint in favor of the non-moving party, a trial court will not accept conclusions of law or unwarranted inferences cast in the form of factual allegations. See City of Heath, Ohio v. Ashland Oil, Inc., 834 F.Supp. 971, 975 (S.D. Ohio 1993). "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl' Corp. v. Twombly, 550 U.S. 544, 555 (2007)(quoting Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly at 555. In deciding a Rule 12(b)(6) motion, this Court must determine not whether the complaining party will prevail in the matter but whether it is entitled to offer evidence to support the claims made in its complaint. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## ANALYSIS

### I.    Personal Jurisdiction

Several of the out-of-state Banks have challenged whether this Court has personal jurisdiction to hear the claims against them. These include: Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp.[8] In order to exercise personal jurisdiction over an out-of-state party, two

---

[8] Personal jurisdiction requirements are waivable rights. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 , n.14 (1985). Those Defendants who did not challenge personal jurisdiction in their first responsive pleading have waived this issue. Fed. R. Civ. P. 12(h)(1); see, e.g., Taubman Co. v. Webfeats, 319 F.3d 770, 773 (6th Cir. 2003); Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1120 (6th Cir. 1994); In Re Wolverine Radio Co., 930 F.2d 1132, 1137 n.5 (6th Cir. 1991).

requirements must be met.  First, the Complaint must allege sufficient jurisdictional facts to bring the action within the purview of Ohio's long-arm statute (O.R.C. §2307.382).  See Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000).  Second, the exercise of personal jurisdiction must comport with the due process requirements of the U.S. Constitution. See Nationwide Mut. Ins. Co. v. TRYG Inter. Ins. Co. Ltd., 91 F.3d 790, 793 (6th Cir. 1996). Plaintiffs bear the burden of demonstrating the exercise of personal jurisdiction is proper.  See American Greetings Corp. v. Cohn, 839 F.2d 1164, 1168 (6th Cir. 1987).

Each Bank challenging personal jurisdiction asserts that it is an out-of-state Bank that does not conduct business in Ohio and that the Plaintiffs making claims against it are not citizens of Ohio.  They also each allege that they have insufficient contacts, ties, or relations with Ohio to justify personal jurisdiction in the state.  The allegations in the Amended Complaint do not conflict with these assertions, and Plaintiffs have provided no other basis upon which this Court could find that the exercise of personal jurisdiction is proper over these Defendants.

Plaintiffs have not identified which section of Ohio's Long Arm Statute would form a basis for the exercise of personal jurisdiction; they have not made any allegations that would demonstrate that their claims arose out of any acts or omissions that occurred in Ohio; they have not provided any allegations or evidence that these Defendants have substantial and continuous contacts with Ohio; they have not shown that these Defendants have any customers, offices, subsidiaries, employees, assets, or real property in Ohio; and, they have not established that these Defendants are registered or licensed to do business in Ohio, pay Ohio taxes, or maintain

any business address, phone number or other contacts in Ohio.[9]

Based on the information currently before the Court, these Defendants do not appear to have sufficient contacts to satisfy the statutory or due process requirements that would allow this Court to exercise personal jurisdiction over them.  The claims against Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers & Merchants Bank of Colby, and German American Bancorp must, therefore, be dismissed.[10]

## II.    UCC Displacement of Tort Claim For "Money Had and Received"

The Depositary Banks argue that the common law claim of "money had and received" (Count Eight) has been displaced by Ohio's codification of the UCC.  This Court explored this argument in detail in Metz v. Unizan Bank, Case No. 5:05 CV 1510, Docket Number 376 (Feb. 28, 2006)[11] and found that this common law claim (when raised in the commercial context involving negotiable instruments) has, indeed, been supplanted by the UCC.  See Olympic Title Ins. Co. v. Fifth Third Bank of Western Ohio, No. 20145, 2004 WL 2009285 at *6 (2nd Dist. Ohio Ct. App.  Sept. 10, 2004);  Amzee Corp. v. Comerica Bank-Midwest, No. 01AP-465, 2002 WL 1012998, at *9-10 (Ohio App. May 21, 2002)(holding that claims for conversion, money

---

[9] Plaintiffs do not respond to the personal jurisdiction argument in their Response to Defendants' motions to dismiss, and have, therefore, effectively conceded to the dismissal of these Defendants.  They do superficially address a challenge to subject matter jurisdiction based on a lack of diversity in the last two pages of their Response brief, but they have made no attempt to counter these Defendants' arguments against the exercise of personal jurisdiction.

[10] Even if this Court could exercise personal jurisdiction over the non-Ohio Drawee Banks listed above, for the reasons set forth below, all of the claims against those Banks would be dismissed along with the claims against all of the other Drawee Banks, based on the statute of limitations.

[11] Please note, when reviewing the Docket in the Metz case, the ECF (Docket) Numbers are not necessarily in chronological order by date of entry.

had and received, money paid by mistake, and unjust enrichment were displaced by the UCC).

Plaintiffs do not challenge the Defendants' contention that the common law cause of action for

"money had and received" has been supplanted by Ohio's codification of the UCC. Rather,

Plaintiffs now characterize their cause of action for "money had and received" (Count VIII) as a

UCC claim. (Response, at 4, 40).

The UCC has created a statutory scheme to assess liability and otherwise allocate losses

arising in the commercial context. However, Plaintiffs have cited no specific provision that

would give them a cause of action against the Depository Banks under the facts set forth in

Count Eight of the Amended Complaint. The claim, therefore, is dismissed for failure to state a

claim upon which relief may be given.[12]

## III.  **Statute of Limitations**

### A.  Applying the Statutes of Limitation to the UCC Claims

The parties agree that the Plaintiffs' claims are based on events which occurred in 1998

and 1999, and that the original Complaint was not filed until September 29, 2008.   The parties

also agree that Plaintiffs' UCC claims[13] are subject to the three-year statute of limitations set

forth in Articles 3 and 4 of the Uniform Commercial Code ("UCC"), codified at O.R.C.

---

[12] Even if Count Eight actually did state a claim under the common law, or the UCC, it is undisputed that the three year statute of limitations set forth in O.R.C. §1303.16(G)(1) would apply. As set forth below, this statute of limitations would have run long before this action was filed, and the claim , therefore, must be dismissed.

[13] The UCC based claims include Count I (violation of O.R.C. §1304.30 - U.C.C. 4-401), Count VI (failure to exercise ordinary care), and Count VII (bad faith in violation of O.R.C. §1304.03).

§1303.16 and O.R.C. §1304.09.[14]  Both of these provisions provide that an action shall be brought within three years of when the cause of action "accrues."

Article 3 provides that:

Unless governed by other law regarding claims for indemnity or contribution, any of the following actions shall be brought within three years from when the action accrues:

(1)     An action for conversion of an instrument, money had and received, or a similar action based on conversion;

(2)     An action for breach of warranty;

(3)     An action to enforce an obligation, duty or right arising under this chapter and not governed by this section.

O.R.C. §1303.16.  Article 4 of Section 1304.09 provides that:

An action to enforce an obligation, duty or right arising under Sections 1304.01 to 1304.04 of the Revised Code shall be brought within three years after the cause of action accrues.

The dispute between the parties centers on how to determine when the Plaintiffs' causes of action accrued.  Neither of the applicable statutes of limitation defines the word "accrues." The current syllabus law in Ohio is that "[a]bsent legislative definition, it is left to the judiciary to determine when a cause "arose" for purposes of statutes of limitations."  O'Stricker v. Jim Walter Corp., 4 Ohio St.3d 84, syllabus ¶ 1, 447 N.E.2d 727 (1983).  The Defendants argue that, for purposes of applying a statute of limitations, unless otherwise specified,  a cause of action accrues at the time the wrongful act is committed.  Further, they contend that Ohio courts have

_____

[14] Claims brought pursuant to O.R.C. §1304.30 (2005)(UCC 4-401) are subject to the statute of limitations set forth in O.R.C. § 1304.09 (2005).

found that this general rule applies to the UCC claims at issue in this case.  Plaintiffs, on the other hand, claim that under Ohio law, "accrual" occurs only after the wrongful acts have been discovered.

The Defendants cite several Ohio cases in support of their contention that the UCC claims in this case accrued at the time of the wrongdoing.  As seen in <u>Palmer v. Mfg. and Supply, Inc. v. BancOhio Nat'l Bank</u>, 637 N.E.2d 386, 390 (1994), cert. denied 69 Ohio St.3d 1488, 635 N.E.2d 43 (1994), and <u>Brentar v. Rupert</u>, No. 73903, 1998 WL 895285 (Ohio App. 8th Dist.  Dec. 17, 1998), Ohio courts have found that the "great bulk of authority runs very strongly against" the application of the discovery rule for claims involving the theft or conversion of negotiable instruments.  In addition, the Ohio General Assembly, in enacting the UCC, specifically chose to toll the running of the statute of limitations until after the injury was discovered in some instances but not in others.  The legislature did not specifically add a discovery rule to the statutes of limitation applicable in this case.  The Ohio Supreme Court has held that the fact that the General Assembly included language establishing a discovery rule under some UCC sections but not in others  "argues strongly that it was not the legislature's intent to apply the discovery rule to [the later] claims."  <u>Investors Reit One v. Jacobs</u>, 46 Ohio St.3d at 181, 546 N.E.2d at 211, citing <u>Kirsheman v. Paulin</u>, 155 Ohio St. 137, 146, 98 N.E.2d 26, 31 (1951).  "The legislature's express inclusion of a discovery rule for certain [claims] . . . implies the exclusion of other torts arising under the statute . . . ."  <u>Id.</u>

Plaintiffs cite no case law to the contrary, rather they argue that the Ohio cases cited by the Defendants are irrelevant because a <u>statutory</u> "discovery rule" applies to these claims.  Plaintiffs point to O.R.C. §2305.09 –  the four year statute of limitations for "certain torts" – as

the statutory  "discovery rule" that should be applied to the statute of limitations set forth in

O.R.C. §1303.16 and O.R.C. §1304.09.  Ohio Revised Code §2305.09 sets forth the statute of

limitations for the following causes of action:   (A) trespassing upon real property; (B) the

recovery of personal property, or for taking and detaining it; © for relief on the ground of fraud;

and (D) for an injury to the rights of plaintiff not arising on contract nor enumerated in sections

2305.10 to 2305.12, 2305.14, and 1304.35 of the Revised Code.  It further states:

> If the action is for trespassing under ground or injury to mines, or for the
> wrongful taking of personal property, the causes thereof shall not accrue until the
> wrongdoer is discovered; nor, if it is fraud, until the fraud is discovered.

The discovery rule established in this section is clearly limited in its application.  It applies only

to the four year statute of limitations for certain actions set forth in sub-sections (A)-© of O.R.C.

§2305.09.

Plaintiffs spend a great deal of their Response brief outlining the legislative history of

this provision and of various statutes of limitation established through Ohio's codification of the

UCC.  None of this information is relevant, however, because O.R.C. §2305.09 has no

application to claims which are given their own specific statute of limitations in the UCC.  This

statute creates a four year statute of limitations for tort actions that are not otherwise specifically

governed by their own statutes of limitations.  The parties, however, agree that a three year

period of limitations, specifically assigned by O.R.C. §1303.16 and §1304.09, apply to the UCC

claims at issue in this case.  Ohio Revised Code §2305.09, therefore, does not apply, and the

definition of accrual specifically aimed at certain sections of that particular statute is not

applicable to the Plaintiffs' claims.

Plaintiffs contend that because the Amended Complaint alleges that James Carpenter was

12

guilty of conversion and fraud, all of the claims in their complaint "were caused by the wrongful taking of their personal property and from fraud."  Consequently, they argue that the discovery rule in O.R.C. §2305.09 should apply to all of their claims, including those brought under various UCC provisions.   However, any claims they may have had (but did not assert in this action) against Mr. Carpenter are irrelevant in determining what statute of limitations applies to the actual claims Plaintiffs brought against the banks.  The statutory claims under the UCC are not legally equivalent to an action for wrongful taking of personal property, fraud, or any other common law cause of action,[15] and whether or not there is some connection between these claims and the allegations made against Mr. Carpenter, they are certainly not interchangeable with potential common law tort claims Plaintiffs may have had against Mr. Carpenter, a legally independent entity.

Further, Plaintiffs do not accuse the Drawee Banks of any fraud or other wrongful taking.   In fact, they have as much as admitted that the Drawee Banks did not "wrongfully" take any personal property from the Plaintiffs.  In Plaintiffs' Introduction on page one of their Response brief, they characterize the actions of the drawee banks as "innocent," claiming only that the UCC transfers the losses of its customers to the bank, and allows the "innocent" bank to then recover the loss from other sources.   There is no way to extrapolate a UCC charge under 4-401 (O.R.C. §1304.30), which the Plaintiffs themselves characterize as a requirement to "refund their victims the face value of stolen checks, **without liability,**" into the equivalent of a

---

[15] The banks are not alleged to have taken any personal property of the Plaintiffs.  Rather, they are accused of honoring checks made out by the Plaintiffs; cashing checks and depositing the money into accounts named for the companies the checks had been written out to.  Checks are not personal property.  They are an obligation on behalf of the drawer of the check to the drawee.

13

"wrongful taking" claim against these banks.[16]

      The UCC claims against the Depositary Banks are for breach of duty to act with ordinary care and failure to act in good faith.  Even if these UCC claims could be equated to some common law cause of action, they would sound in negligence or bad faith, not in conversion or the wrongful taking of property.[17]  Therefore, the discovery rule imposed by O.R.C. §2305.09 would still not apply to such claims.[18]

      This Court is bound to apply state law in accordance with the currently controlling decisions of the state's highest court.  Bailey Farms, Inc. v. NOR-AM Chemical Co., 27 F.3d 188, 191 (6th Cir. 1994).  Where the state supreme court has not specifically addressed a particular issue, this Court is charged with anticipating how that court would rule.  Id.  The Court conducted an exhaustive review of all of case law on both sides of this issue in the case of Metz v. Unizan Bank, Case No. 5:05 CV 1510, Docket Numbers 376 and 600 (Feb. 28, 2006 and Sept. 16, 2008), and found that Ohio law does not support grafting a discovery rule onto the determination of the accrual date for the UCC claims at issue in this case.  There has been no

---

[16] Plaintiffs reiterated this position during oral arguments, emphasizing that the Drawee Banks were allegedly legally bound to re-credit the Plaintiffs for their losses even though they were without fault.  During the same portion of the argument, Plaintiffs argued that O.R.C. §2305.09 (D)  would apply to these claims.  However, the language adding a discovery rule to the definition of accrual does not apply to subsection (D).

[17] Plaintiffs did bring separate and independent claims for fraud and aiding and abetting in tortious behavior against the Depositary Banks.  The legal analysis of the statute of limitations and discovery rule issues differs with regard to those tort claims and will be addressed later in the opinion.

[18] Plaintiffs spent some time during oral argument explaining why they believed the UCC claims made in this case would fall under subsection (D) of O.R.C. §2305.09.  However, even if this were true, the discovery rule contained in that statute does not apply to claims described in sub-section (D).  The plain language of the discovery rule clause limits its application to only certain types of claims set forth in sub-sections (A)- (C).

change in the law that would alter the reasoning behind that decision.  In fact, although there was

no Ohio law directly addressing the two statutes of limitation at issue in this case when the <u>Metz</u>

case was decided, two Ohio courts have since specifically applied the general definition of

accrual (without a discovery rule) to those statutes of limitations.  <u>See</u> <u>Western Ohio Colt Racing</u>

<u>Assoc. v. Fast</u>, Mercer App. No. 10-08-15, 2009-Ohio-1303 (finding that, consistent with the

general rule in Ohio, cause of action subject to statute of limitations contained in O.R.C.

§1303.16(G)(1) accrued when the wrongful act was committed); <u>Connors v. U.S. Bank</u>, Franklin

App. No. 07 AP-649, 2008-Ohio-1838 (holding that for purposes of O.R.C. §1303.16(G) and

O.R.C. §1304.09, a cause of action accrues at time of wrongdoing).

   The general and longstanding rule in Ohio is that a cause of action accrues at the time the

harm is committed and not when it is discovered.  The discovery rule is an exception, either

statutorily or judicially imposed.  There is no applicable statutory exception, and the Ohio Courts

have not found any other compelling justification for applying the discovery rule under these

circumstances.  Therefore, this Court finds that Ohio law does not support the application of the

discovery rule to toll the running of the limitations period contained in O.R.C. §1303.16(G) or

O.R.C. §1304.09.

   The parties agree that the alleged UCC violations occurred in 1998 and 1999, and that the

statutes of limitations for each of the corresponding UCC claims was three years.  Thus, the

Plaintiffs cause of action on the UCC claims would have expired no later than the end of 2002.

This lawsuit was not filed until September of 2008.   All of the Plaintiffs UCC claims are,

therefore,  barred by the statutes of limitations set forth in  O.R.C. §1303.16(G) or O.R.C.

§1304.09, and Counts One, Six, Seven, and Eight must, therefore, be dismissed.

B.    Applying the Statute of Limitations to the Fraud-Based Claims

Counts Two through Five (Fraud, Fraudulent Concealment, and Conspiracy to Commit

Fraud), and Count Nine (Aiding and Abetting) of the Amended Complaint are common law

claims against the Depositary Banks (Huntington National, Fifth Third,  Sun Trust,  and

Wachovia).  Defendants argue that these claims are governed by the statute of limitations in

O.R.C. §1707.43(B).  Ohio Revised Code §1707.43(B) applies to causes of actions arising from

the sale of securities.  It states that actions "for any recovery based upon or arising out of a sale

or contract for sale" of securities must be brought within "two years after the plaintiff knew, or

had reason to know, of the facts by reason of which the actions of the person . . . were unlawful,

or [within] five years from the date of such sale or contract for sale, whichever is the shorter

period."  Id.

Plaintiffs' Response to Defendants' Motion to Dismiss is somewhat confusing on this

issue.  Although it is clear that Plaintiffs don't believe O.R.C. §1707.43(B) is the appropriate

statute of limitations to apply, they don't specify what other statute would be applicable to the

fraud-based claims.  Although it would potentially result in a shorter statute of limitations, they

seem, at times, to be arguing that all of their claims should be subject to the statute of limitations

in the UCC.  Their own arguments even seem to discount the validity of any claims of actual

fraud against the banks.[19]  During oral argument, Plaintiffs argued that the statute of limitations

for securities fraud shouldn't apply to the fraud-based claims because the UCC governs "banking

---

[19] Plaintiffs' argument reads as follows: "The Defendants at bar are all banks.  They are
either liable without fault pursuant to R.C. 1303.03, as part of the loss-allocation rules of the
Ohio UCC, or their liability is for fault plead [sic]EXCLUSIVELY in the manner in which they
opened and maintained checking accounts, and negotiated checks (or for Huntington, in the way
it negotiated with a criminal)." (Response at 38)(emphasis in the original).

torts," and the UCC is the sole means by which the Plaintiffs can recover their money.  There was also a  strong implication in this argument that the Plaintiffs were not actually injured by the alleged fraud, but only by the eventual cashing of the checks they wrote to Lomas and Serengeti.  Nonetheless, Plaintiffs have brought non-UCC, fraud-based common law claims against the banks, alleging (however conclusory those allegations may be) knowledge, complicity, and conspiracy in the underlying fraud allegedly committed by James Carpenter.  Setting aside those arguments that seem somewhat incompatible with the fraud-based claims set forth in the Amended Complaint, the Court will assume that Plaintiffs meant to argue that the general statute of limitations for fraud set forth in O.R.C. §2305.09(D)(a four year statute of limitations, with a discovery rule) should apply.

Addressing the question of whether O.R.C. §1707.43 or O.R.C. §2305.09 would be the appropriate statute of limitations, in a case with identical facts and nearly identical claims, this Court has previously held that under these circumstances Ohio law dictates that O.R.C. §1707.43(B), the statute of limitations for securities fraud, is the proper statute to apply.

> The facts underlying the fraud claims are inextricably intertwined with allegations that the Defendants conspired with Mr. Carpenter to engage in securities fraud . . . The fact that the Amended Complaint does not specifically state a claim for securities violations is not dispositive . . . . "The Supreme Court of Ohio directs that when courts are faced with determining the statute of limitations that governs a claim, they 'must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded.'" ([Metz Feb. 8, 2008 Rep. And Recom.], citing Lawyer's Coop. Pub. Co. v. Muething, 603 N.E.2d 969, 973 (Ohio 1992)).  In this case, there are allegations of securities fraud even though no actual claims under the state or federal securities laws have been made.
>
> Further, even if no actual sale of securities occurred, the Plaintiffs had attempted to buy securities, and it was only by operation of the alleged fraud that an actual sale was prevented.  Under the plain language of the statute, an actual sale is not necessary to trigger the statute of limitations in O.R.C. §1707.43(B).  Whether or not an actual security was purchased, there can be no doubt that the allegations in

17

the Amended Complaint establish that the Plaintiffs contracted for the sale of
securities . . . The Court, therefore, finds that the statute of limitations set forth in
O.R.C. §1707.43(B) applies to the fraud claims in this action.

( Metz v. Unizan Bank, Case No. 5:05 CV 1510, Docket Number 555, at 3-4 (May 7, 2008)).

Plaintiffs have offered no argument why this reasoning would not apply equally in this case, nor

have they shown any change in the law that would justify a different holding.  Therefore,

Ohio Revised Code §1707.43(B) will be applied  to Counts Two through Five, and Count

Nine of this action.

In the Metz opinion, this Court held that, although O.R.C. §1707.43(B) was the

appropriate statute of limitations, the absolute five year period of limitations contained in the

statute is not enforceable because it would violate the right-to-remedy clause of the Ohio

Constitution.[20]  Under Ohio law, an unenforceable provision in a statute may be severed, leaving

the constitutionally valid sections of the statute in force.  O.R.C. §1.50; State, ex rel. Doersam v.

Industrial Commission of Ohio, 45 Ohio St.3d 115,121, 543 N.E.2d 1169, 1175 (1989).

Therefore, the two year period of limitations, statutorily tolled until after the Plaintiffs knew or

had reason to know of the "facts by reason of which the actions of the person . . .  were

unlawful" is the governing language in that statute.

As set forth above, the parties agree that the Plaintiffs' claims are based on events which

occurred in 1998 and 1999, and that the original Complaint was not filed until September 29,

2008.  The Plaintiffs claims survive only if they were brought within "two years after the

plaintiff knew, or had reason to know, of the facts by reason of which the actions of the person. .

---

[20] A detailed analysis of the law and history leading to this conclusion is provided in the
Metz opinion (Order dated May 7, 2008, ECF # 555).  As the parties have offered no new law or
argument challenging this holding, there is no need to repeat that analysis here.

. were unlawful."  In this case, that means that if they knew or had reason to know of any such facts prior to September 29, 2006, their claims are untimely and must be dismissed.

"[C]onstructive notice is . . . sufficient to start the two-year period" running under O.R.C. §1707.43(B).  Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 561 (6th Cir. 2005).  Tolling of the statute of limitations by exercise of the discovery rule ends when Plaintiffs are deemed to be on "notice to investigate the facts and circumstances relevant to [their] claim in order to pursue [a] remedy."  Flowers v. Walker, 63 Ohio St.3d 546, 549 (Ohio 1992).  The discovery of  "suspicious facts," triggers a potential plaintiff's duty to investigate. See Wyser-Pratte Mgmt. Co., 413 F.3d at 561.  The limitations period then begins to run, when through the exercise of reasonable diligence, a plaintiff discovers the facts underlying his or her alleged claim(s).  Id.  In other words, when applying the discovery rule, a cause of action accrues when Plaintiffs become aware of facts that should alert them that they may have claims to pursue. They need not be aware of the actual causes of action, or legal theories underpinning their eventual claims in order to trigger the running of the limitations period. See Flowers, 63 Ohio St.3d at 548–49.

In this case, there were a series of events that should have raised the Plaintiffs' suspicions that something illegal had occurred.   While taken alone, each of these events may not have been sufficient to trigger the running of the statute of limitations, together they certainly should have spurred a reasonable investor to investigate further and pursue a potential remedy.  The first indication that something may have been seriously amiss with the Lomas and Serengeti investments is outlined in the Amended Complaint.  Paragraph Three of that Complaint states that sometime after the Plaintiffs stopped receiving interest payments and were unable to redeem

their debentures upon maturity, Carpenter "organized the victims to present their claims to the corporate guarantor of the notes: The New England International Surety Corp. . . . (hereinafter "NEISC") . . . [T]he purported owner of NEISC apparently responded that Lomas and Serengeti were frauds, and their claims could not be honored, in 2000 or 2001."

In addition to their early knowledge that they were no longer receiving payments, could not redeem their debentures, and that the guarantor was refusing to honor their claims based on alleged fraud by the investment companies, the Plaintiffs had access to public information from various sources that would have put them on notice of Carpenter's alleged fraud more than two years before this action was filed. Included among these sources were James Carpenter's past criminal history and disbarment,[21] James Carpenter's indictment for illegal activities directly related to the claims in this case,[22] the issuance of Cease and Desist orders to Carpenter and several other brokers by the Securities Division of the Ohio Department of Commerce,[23] and the

---

[21] Plaintiffs repeatedly argue that the Depositary banks should have been aware of James Carpenter's past criminal history and disbarment, and should have denied him the ability to open accounts on that basis. By the same reasoning, Plaintiffs could have discovered Mr. Carpenter's past history (a matter of public record) prior to buying investments from him, or at least upon a cursory investigation after those investments stopped paying interest, were dishonored, and were labeled as "fraud" by the guarantor in 2000 or 2001. (See, Amended Complaint at 38-39) (alleging Carpenter's disbarment in 1993 and guilty plea to felony Bank Fraud, Aggravated Theft, Grand Theft, and Theft in Office in or about 1991 were matters of public record). An investor is in the best position to investigate the background and legitimacy of his own investments (and the brokers he is buying from).

[22] James Carpenter was indicted in 2005 for his role in creating the fraud alleged in the Amended Complaint. His indictment was unsealed on January 4, 2006 and he was publically arraigned in connection with the alleged Serengeti and Lomas frauds on that day. See United States v. Carpenter, Case No. 1:05 CR 586 (N.D. Ohio 2005).

[23] The Complaint in the Posen case (a class action whose class definition included the Plaintiffs in this action) admitted that from 1999 to 2000, the Securities division of the Ohio Department of Commerce issued cease and desist orders to Carpenter and several brokers selling Serengeti and Lomas notes on his behalf. These orders are public records.

20

filing of the Metz case.[24]

 The clearest evidence that the Plaintiffs were on notice that they had possible claims, however,  is the filing of the Posen action.  In 2000, a suit captioned Posen, et al. v. New England Surety, Inc., et al., No. 2000-06-2623 was filed as a putative class action in Summit County Ohio.   This suit alleged fraud against James Carpenter, NEISC, and others in connection with the Lomas and Serengeti investments. (Fifth Third Mot. to Dismiss, Ex. A: Posen I Compl.).   The Plaintiffs in the instant case all fell within the class definition of the putative class in

Posen.[25]  (Id. ) The Summit County Court certified the class in an Order dated May 6, 2004, and a Notice and Opportunity to Opt Out was approved by the Court on December 30, 2004.  ( Posen, et al. v. New England Surety, Inc., et al., No. 2000-06-2623).  Assuming the notice was served or published in accordance with the court's order, each of the Plaintiffs in this case would

---

 [24] The Plaintiffs in the Metz case brought claims nearly identical to those raised in this action.  This shows that information sufficient to support the Plaintiffs claims must have been available prior to March of 2005 because other supposed victims of the same alleged fraud filed a complaint nearly identical to this one at that time.  See Gumbus v. United Food and Commercial Workers Int'l Union, Nos. 93-5113, 93-5235, 1995 U.S. App. LEXIS 523 (6th Cir. Jan. 6, 1995)("We believe that reasonably diligent plaintiff should have known about and monitored the progress of [a class action lawsuit]" which raised similar claims against the defendants.)  Further, although we do not directly impute counsel's knowledge to his clients in this case, it also bears noting that Plaintiffs' counsel was well aware of all of the facts and legal theories behind the claims in this action at least as early as 2004, having worked on the Posen class action and having helped draft the original Metz Complaint.  (Huntington Mot. to Dismiss, Ex. 1: Morris Aff. ¶¶ 9, 12-14).  Later in October of 2005, Mr. Morris filed a motion to intervene in Metz on behalf of two additional named Plaintiffs.

 [25] The Posen complaint defines the proposed class as "all individuals who, during the time period between and including 1997 and 1999, purchased promisory notes from Defendant Carpenter or the Carpenter Corporations, in either Serengeti or Lomas, and who were injured when both Serengeti and Lomas defaulted on the notes and New England failed to make payments on the guarantees."  (Fifth Third Mot. to Dismiss, Ex.  A: Posen I Complaint, at 7).

have had notice of the alleged fraud well in advance of two years before the filing of the instant action.[26]

Although this Court accepted in Metz that this series of events (without the benefit of any discussion relating to the Posen case) may have been sufficient to create notice of the Plaintiffs injuries and of Carpenter's wrongdoings, it could not determine from the pleadings in Metz that the Plaintiffs should have discovered the involvement of the specific Depositary Banks more than two years before the Metz case was filed (March of 2005).  There is additional information in instant Complaint, however, that suggests even before the alleged fraud came to light, these Plaintiffs knew that their checks had been cashed and deposited in the Serengeti and Lomas accounts at the Depositary Banks, and knew that they had received interest checks from Depositary bank accounts bearing the name of Serengeti and Lomas.  (Amended Complaint at 14, 15).  If, as Plaintiffs allege, these accounts were fraudulent, and if, as Plaintiffs allege, the banks had some duty to discover and prevent the use of these fraudulent accounts, then Plaintiffs should have investigated the banks' involvement in the alleged fraud as soon as they were alerted to suspicious facts involving these accounts.[27]  There is an argument, therefore, that once the Plaintiffs were aware of the alleged fraud by Carpenter (or even an alleged fraud by Lomas

---

[26] The proposed Notice of Class Settlement filed by the Posen class attorneys later in the litigation noted that over 400 class members had been identified.  Of those eight opted out, and just over twenty had not been identified or contacted.  The order approving the notice of class certification was issued three years and almost eight months before this action was filed, well outside the two year statute of limitations.

[27] Further, under the Plaintiffs' theory in this case, it would be obvious that Carpenter's fraud could not have occurred with the participation of the Depositary banks because in Plaintiffs words "[w]ithout the ability to cash and write checks in the names of non-existent companies, [the alleged fraud] would have been impossible."  (Response at 41).  According to Plaintiffs' oral argument no injury occurred until the banks funded and deposited the checks in the Serengeti and Lomas accounts.

and/or Serengeti), the statute of limitations would have begun to run against the banks as well because the Plaintiffs had knowledge that the Banks had opened accounts for these allegedly fraudulent businesses and allowed James Carpenter to cash checks and deposit the funds into these accounts, and to write checks from these accounts.  This should have triggered the Plaintiffs to further investigate the banks' role in opening and managing the accounts.

If that is not enough to determine that sufficient facts were or should have been discovered by the Plaintiffs before September of 2006, there is another significant difference between this and the Metz case on this issue.  Each of the Depositary Banks in this action had been the subject of extensive discovery in the Posen case, and each had been identified as having accounts related to the Lomas and Serengeti investments prior to September of 2006 (two years before the instant case was filed). (See Posen docket, Summit County Court - multiple entries). Although this information was not discussed in Metz,[28] the information was known to all Plaintiffs (as members of the Posen class) in this action more than four years prior to the filing of their original Complaint.

In addition, the Posen Complaint identified Ashley Carpenter, her employment with First National Bank of Zanesville (the predecessor to Huntington National Bank),  and her involvement in the alleged fraud.   This occurred far more than two years before the instant case was filed.  Therefore, Plaintiffs specifically knew or had reason to know of the facts by reason of which the Depositary Bank First National Bank of Zanesville's (succeeded in interest by Huntington National Bank) actions were allegedly unlawful more than two years before this

_____

[28] The information would have been irrelevant to the statute of limitations issues in Metz because Metz was filed less than two years after the class certification in Posen was granted, and the bank related discovery took place.

action was filed.   As set forth above, whether or not a legal theory for recovery had been identified or pursued against the banks is irrelevant to the running of the statute of limitations on those potential causes of action.   Only the facts underlying the cause of action need be known to trigger the running of the statute of limitations; it does not matter whether the Plaintiffs understood the legal significance of those facts.   See Flowers, 63 Ohio St.3d at 548-49.

Plaintiffs argue that even if the statute of limitations would otherwise have run, their action was timely filed because it was tolled by  Metz. According to Plaintiffs,  Metz was filed as a proposed class action and they fell under the stated class definition, therefore the statute of limitations on their claims in this case should be tolled from the date of the Metz filing until the class certification request was denied in March of 2009.  This would effectively toll the running of the statute of limitations for nearly four years, and would save the claims from a summary dismissal on statute of limitations grounds.  Generally, the filing of a class action does toll the statute of limitations as to all putative class members.  See Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974); Crown Cork & Seal Co. v. Parker, 462 U.S. 345, 349 (1983).  There are, however,  exceptions to this general rule that prevent its application in this case.  Primarily, the general rule does not apply when a plaintiff chooses to file an independent action without waiting for a determination on class certification in the previously filed suit. See  Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 568 (6th Cir. 2005).   The instant action was filed in September of 2008, nearly six months prior to the March 2009 class certification determination in Metz.  Therefore, the exception applies, and the filing of the Metz case did not toll the applicable statute of limitations for these Plaintiffs in this action.  For these reasons, Counts Two through Five, and Count Nine of the Amended Complaint, were filed after the expiration of the

applicable statute of limitations, and they are dismissed as untimely.

**IV.  Substantive Arguments for Dismissal of the Common Law Claims**

        A.      Counts Two through Five - Fraud, Fraudulent Concealment, and  Conspiracy to Commit Fraud (Depositary Banks)

              1.  Fraud

Under Ohio law, the elements of fraud are : (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying on it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. See Cohen v. Lamko, Inc., 462 N.E.2d 407, 409 (Ohio 1984).  Under Federal Rule of Civil Procedure 9(b), an allegation of fraud must be stated with particularity.  At a minimum a party must allege "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."  Michaels Bldg. Co. v. Ameritrust Co. N.A., 848 F.2d 674, 679 (6th Cir. 1988).

The allegations underlying the fraud-based claims against the Depositary Banks stem from the fact that these Defendants accepted checks written by the Plaintiffs for deposit in accounts opened by Carpenter in the name of Serengeti and Lomas, and in some cases from the fact that interest checks, redemptions and refunds were paid to some Plaintiffs from those accounts.  Plaintiffs basically contend that simply allowing these accounts to exist and operate was tantamount to a representation to the Plaintiffs that Serengeti and Lomas were legitimate companies that were "performing substantial economic activity."  Plaintiffs further allege that

this "representation" was false.  As a matter of law, however, a depositary bank makes no representation to the drawer of a check simply by accepting that check for deposit.  See G.F.D. Enterprises, Inc., 37 Ohio St.3d at syl. ¶5, 525 N.E.2d at 12 (1988)("the presentment and transfer warranties made by a depositary bank in obtaining or transferring an instrument pursuant to Ohio Revised Code §1304.13 (UCC § 4-207) do not run to the drawer of such instrument.").  Further, the mere existence of a bank account, without more, is not a representation by a bank to the general public that the name on the account accurately indicates the true owner of the account, or that the owner of the account is a legitimate, trustworthy, economically sound entity.

There are no allegations that employees of the Depositary Banks had any actual contact or communication with any of the Plaintiffs (in their role as a Depositary Bank) or that they made any actual statement or other representation (false or otherwise) to any of the Plaintiffs. [29] Consequently, there are also no allegations as to the identity of the person(s) allegedly making a misrepresentation, or the time or place of the alleged misrepresentation as required under the pleading standards for fraud.[30]

_____

[29] The only allegations of a supposed misrepresentation don't even extend to all of the Plaintiffs.  The Amended Complaint states: "Still other Plaintiffs received clearly marked bank stamps on the back of their returned investment checks that made it appear that their checks had been deposited into a bank account entitled Lomas or Serengeti."  (Amended Complaint at 15-16) (emphasis added).  Further, although it later alleges "these indicia of legitimate economic activity [were] ... supplied by the Defendant depositary banks,"  this statement does not clearly allege which banks, if any, returned checks to which Plaintiffs, which banks, if any, stamped the checks, or what information the stamps actually conveyed.

[30] As to Huntington Bank, the Amended Complaint alleges only that "representations originated at the branches where the accounts were opened and were directed to the victims at their residences or places of business."  (Amended Complaint at 54).  This allegation is far too vague to satisfy the pleading requirements for fraud.  It does not provide the Defendants with adequate information upon which to base a defense as there is no identification of a person making the alleged representation or receiving the alleged representation, or any information that would allow the Defendants to determine how the alleged representation was communicated or

Plaintiffs have also failed to plead any facts that would support the allegation that they "justifiably relied" on the Depositary Banks' alleged misrepresentations.  By the time the checks were cashed and deposited into the suspect accounts, and certainly before Plaintiffs received cancelled checks or bank statements showing that this had been accomplished, the Plaintiffs had already written the checks to Serengeti and/or Lomas, and had already given those checks to James Carpenter (either directly or through a broker/agent), thereby entering into and memorializing an obligation to those entities.  Plaintiffs allege no further act (or failure to act) that they entered into in reliance on the Bank's alleged "misrepresentations."   The Amended Complaint, therefore, fails not only to plead a cause of action for fraud with the specificity required by Fed. R. Civ. P. 9(b),[31] but also, because there are no allegations of an actual representation by the Depositary Banks to the Plaintiffs, and no factual allegations supporting the element of justifiable reliance, it fails to state a claim upon which relief can be granted.  <u>See generally</u>, <u>Bender v. Southland Corp.</u>, 749 F.2d 1205 (6th Cir. 1984).

2.     <u>Fraudulent Concealment</u>

Fraudulent concealment requires more than mere non-disclosure.  <u>See</u> <u>Arbor Village Condominium Assoc. v. Arbor Village, Ltd.</u>, 95 Ohio App.3d 499, 510 (Ohio App. 1994).  In

---

where each Plaintiff received the alleged representation.

As to Fifth Third, Wachovia, and Sun Trust, Plaintiffs allege that misrepresentations were communicated through bank statements sent by the Plaintiffs' Drawee Banks to the Plaintiffs. The Depositary Banks cannot be liable for a representation or communication made by a wholly independent entity (the Plaintiffs' Drawee Bank) to the Plaintiffs, whether or not the statement was false.  Further, there is no allegation that the bank statements sent by the Drawee Banks actually contained any false information whatsoever.

[31] The only argument Plaintiffs put forth in their Response to the Defendants' Motion to Dismiss to counter this finding is that their "amended complaint is 67 pages long" and "shorter books have won Nobel prizes for literature."  (Response at 42).  This is an inane argument: it should go without saying that the length of a Complaint bears no relation to its legal sufficiency.

order to plead fraudulent concealment, a plaintiff must allege both a wrongful failure to disclose

certain information, and a duty to disclose that information.  See Birkett Williams Ford, Inc. v.

East Woodworking Co., 8 Ohio App.3d 231, 234 (8th Dist. 1982); Federated Mgmt. Co. v. Cooper

& Lybrand, 137 Ohio App. 3d 366, 383, 738 N.E.2d 842, 854 (Franklin App. 2000); see also,

Steinfels v. Ohio Dept. Of Commerce, 129 Ohio App. 3d 800, 807, 719 N.E.2d 76, 82 (Franklin

App. 1998).  The duty to disclose arises only when one party has information "that the other

[party] is entitled to know because of a fiduciary or other similar relationship of trust and

confidence." State v. Warner, 55 Ohio St.3d 31, 59, 564 N.E.2d 18, 39 (1990)(citing Chiarella v.

United States, 445 U.S. 222, 224-225)(1980)); see also, Federated, 137 Ohio App.3d at 384.

Nowhere in the Amended Complaint do the Plaintiffs allege a fiduciary or other trust relationship

that would give rise to a duty to disclose by the Depositary Banks, and nowhere in their Response

to the motions to dismiss do Plaintiffs cite any law that would indicate that such a duty exists

based on the facts and circumstances alleged in this case.[32]  Plaintiffs claim for fraudulent

concealment, must, therefore, be dismissed.

### 3.    Conspiracy to Commit Fraud

Ohio law defines civil conspiracy as "a malicious combination of two or more persons to

injure another in person or property, in a way not competent for one alone, resulting in actual

damages." Kenty v. Transamerica Premium Ins. Co., 650 N.E.2d 863, 866 (1995)(citations

omitted).  The elements of this claim include : (1) a malicious combination; (2) involving two or

more persons; (3) injury to persons or property; and, (4) the existence of an unlawful act

---

[32] Generally courts have held that a depositary bank does not owe any duty to a non-customer.  See, e.g., Condor v. Union Planters Bank, N.A., 384 F.3d 397, 399-400 (7th Cir. 2004).

independent from the actual conspiracy."  Aetna Cas. And Sur. Co. v. Leahey Const. Co., 219

F.3d 519, 534 (6th Cir. 2000)(quoting Universal Coach, Inc. v. New York City Trans. Auth. Inc.,

629 N.E.2d 28, 33 (Ohio Ct. App. 1993).

     The alleged fraud perpetrated by James Carpenter is the unlawful act upon which the

conspiracy claim is based.  The Amended Complaint, however,  does not allege any facts that

would even imply that the Depositary Banks, Fifth Third, Wachovia or Sun Trust  "shared in the

conspiratorial objective" of James Carpenter's fraud.[33]   Even if the Amended Complaint

sufficiently alleged knowledge of the alleged fraud, or recklessness in failing to discover the

fraud, this does not equate to a shared objective to commit the fraud.  As the first element of a

conspiracy charge has not been properly alleged, the Plaintiffs have failed to state a claim for civil

conspiracy in Counts Three through Five of the Amended Complaint.

     Because additional facts were alleged against Huntington Bank, the element of "malicious

combination" may, however, have been sufficiently asserted against that Defendant.

Nonetheless, Plaintiffs claim fails as against this Bank, as well.  The allegations supporting the

element of "malicious combination" in Count Two against Huntington Bank are based on the fact

that James Carpenter's daughter, Ashley Carpenter, opened the accounts at issue in that Count.

The Amended Complaint alleges that she knew of her father's prior convictions and that she was

aware of his intent to use these accounts to perpetrate a fraud.   The Amended Complaint also

alleges that Ashley Carpenter performed these actions in her capacity as an employee of FNB (the

predecessor to Huntington).  Ashley Carpenter's alleged involvement in the fraud, in fact, was so

---

     [33] Plaintiffs allegation that "unknown employees. . . maliciously conspired with
Carpenter. . . " is insufficient to satisfy the pleading requirements for conspiracy to commit
fraud.  The information states no actual facts, and is far too vague to allow the Defendants to
investigate and defend themselves against the charge.

prominent that she was personally sued for her involvement in the earlier <u>Posen</u> case. That case settled, and the settlement was approved as a class settlement.[34] Because the current Plaintiffs were all included under the definition of the class in <u>Posen</u>, any claims they may have had against Ashley Carpenter were settled and released in that action.

Under Ohio law the release of Ashley Carpenter in the <u>Posen</u> case also extinguishes any claim against Huntington Bank that arises under a theory of (successor) vicarious liability. "[T]he release of a party who is primarily liable operates also as a release of any party who was only secondarily liable." <u>Niemann v. Post Industries, Inc.</u>, 68 Ohio App. 3d 392, 396, 588 N.E.2d 301, 303 (Ohio Ct. App. 1991(citing <u>Bello v. Cleveland</u>, 106 Ohio St. 94, 138 N.E. 526 (Ohio 1922)); <u>see also</u>, <u>Losito v. Kruse</u> (1940), 136 Ohio St. 183, 188, 24 N.E.2d 705, headnote 18("A settlement with and release of the servant will exonerate the master."); <u>Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A.</u>, 2007 U.S. Dist. LEXIS 65078, at **22-24; <u>Munson v. United States</u>, 380 F.2d 976, 977-980 (6th Cir. 1967); <u>Mickowski v. Visi-Trak Worldwide, LLC</u>, 321 F.Supp.2d 885, 897 (N.D. Ohio 2004)("[T]he release of the primary tortfeasor releases the secondary tortfeasor, where the theory against the secondary tortfeasor is vicarious liability."); <u>Radcliffe v. Mercy Hosp. Anderson</u>, 1997 Ohio App. LEXIS 1997, at *3-5 (release of the primary tortfeasor "necessarily extinguished" any secondary liability); <u>Wells v. Spirit Fabricating Ltd.</u>,

---

[34] The release language applicable to Ashley Carpenter reads as follows: "Plaintiffs, on behalf of themselves and their devisees, heirs, executors, administrators, insurers and insureds, do hereby forever release, acquit and discharge Defendants form any and all claims, liens, demands, obligations, judgments, actions, causes of action and liabilities whatsoever (except as specified herein)... arising from the Investments or the Dispute. Plaintiffs agree to cease and desist from further prosecution of any claims and defenses against Defendants in connection with the Investments or Dispute." (Posen Journal Entry at 7). The "Investments" were defined as the promissory notes plaintiffs had purchased in Serengeti and Lomas from 1997 to 1999, and the "Dispute" was defined as the dispute relating to those investments. (<u>Id.</u> at 2).

113 Ohio App. 3d 282, 291-294 (1996)(where liability is based on *respondeat superior*, release of the primary tortfeasor releases the secondary liability); <u>Havens-Tobias v. Eagle</u>,  2003 Ohio App. LEXIS 1512 (2nd Dist. Ohio 2003).

Plaintiffs argue that this common law rule was superceded by Ohio Revised Code §2307.28.  The argument is without merit.  Ohio Revised Code §2307.28 applies only when there are joint or multiple tortfeasors, each contributing to the harm incurred.  It has no application to employer or secondary liability where the only theory of liability is vicarious liability or *respondeat superior*, and the employer is alleged to be acting through the employee rather than in concert with her.

Plaintiffs further argue that Huntington's liability is based not only on *respondeat superior*, but, because a corporation can only act through its employees, officers, and agents, Ashley's knowledge and intent is imputed to her employer and they are directly liable as well. Plaintiffs also argue in their Response to the Defendants' Motions to Dismiss that after Ashley Carpenter assisted her father in setting up the allegedly fraudulent accounts, her employer ratified that fraud.  The Amended Complaint makes no allegation or suggestion of ratification. Plaintiffs offer no facts or other explanation of what acts FNB or its successors took to ratify the alleged fraud.[35]  To the contrary, the facts alleged in the Amended Complaint show that once notified of irregularities in the accounts, FNB took action to close the accounts and discontinue doing business with Mr. Carpenter.  (Amended Complaint at 54-55).  Plaintiffs, therefore, have failed to

---

[35] They do allege that"Huntington earned fees and interests" from the accounts, however there is no allegation that these alleged fees stemmed from anything other than the banks's ordinary course of business.  There is no allegation that they shared in proceeds from the alleged fraud or otherwise received higher or additional fees because of the alleged fraud.  (Amended Complaint at 19).

31

allege any facts that would support the claim that FNB (or Huntington) ratified the actions of Ashley Carpenter.   The Amended Complaint appears to allege no basis for liability against Huntington, except through vicarious liability for the actions of its predecessor's employee, Ashley Carpenter.  As these claims are barred by the settlement and release in <u>Posen</u>, they must be dismissed.

  B. <u>Count Eight - Money Had and Received (Depositary Banks)</u>

  Even if the common law claim for money had and received had not been supplanted by the UCC, and wasn't barred by the applicable statute of limitations, this Count of the Amended Complaint would have to be dismissed for failure to state a claim upon which relief could be granted.  The common law claim for money had and received is a quasi-contractual claim akin to unjust enrichment.  It is an equitable action based on a moral obligation to make restitution where a retention of benefits bestowed would result in injury and injustice.  <u>See</u>  <u>National City Bank, Norwalk v. Strang</u>, 84 Ohio App.3d 764, 766 (Huron Cty. 1992).  The Amended Complaint, however, makes no allegation that Plaintiffs bestowed a benefit on the Depositary Banks.  There are no allegations of a quasi-contractual relationship between Plaintiffs and the Depositary Banks, nor is there any allegation that the Banks retained any money given to them by the Plaintiffs.

  C. <u>Count Nine - Aiding and Abetting in James Carpenter's Tortious Activity (Depositary Banks)</u>

  Contrary to the arguments of the Depositary Banks, the Sixth Circuit has recognized "aiding and abetting" as a common law claim under Ohio law.  <u>Aetna</u>, 219 F.3d at 533-34.  In <u>Aetna</u>, the court held that "the Supreme Court of Ohio would recognize aiding and abetting liability if squarely faced with the issue."  <u>Id.</u>  As this Court is bound by Sixth Circuit precedent,

aiding and abetting is presumed to be a valid cause of action.

Aiding and abetting has two main elements: (1) knowledge that the primary party's conduct is a breach of duty and, (2) substantial assistance or encouragement to the primary party in carrying out the tortious act.  Id. at 533.  The knowledge element  for aiding and abetting can only be satisfied by actual knowledge; constructive knowledge does not suffice.  Id. at 536. Circumstantial evidence of knowledge, however, is sufficient to allow an inference of knowledge on the part of the defendant.  Id. at 535.

The Sixth Circuit has adopted the position that atypical banking transactions may be sufficient to imply the level of knowledge necessary to support an aiding and abetting claim.  Id. at 536 (citing Camp v. Dema, 948 F.2d 455, 499 (8th Cir. 1991); Woodward v. Metro Bank of Dallas, 522 F.2d 84, 97 (5th Cir. 1975)).  Because the Amended Complaint alleges that the Banks' failed to follow their own policies or industry standards in setting up the Serengeti and Lomas accounts for James Carpenter, they have arguably pled enough to infer knowledge of Mr. Carpenter's alleged wrongdoings, and to avoid dismissal on this basis, at this stage of the litigation.[36]

To prove substantial assistance, Plaintiffs must show that "the secondary party

_____

[36] The Amended Complaint charges that "all four (4) of the depository banks that are defendants in this case had internal security measures designed to prevent such activity.  On the belief or knowledge of the Plaintiffs, all of them negligently, recklessly and or knowingly violated their internal security measures while laundering money for Carpenter.  On the belief and knowledge of the Plaintiffs, these internal security measures had become the industry standard by the years 1998 and 1999. . .  ." (Amended Complaint at 12).  However, it is disputable whether or not Plaintiffs even believed that any of the Depository Banks besides Huntington is actually liable for "knowingly" participating in the fraud. ( See Amended Complaint at 14)("The Plaintiffs never knew that the actual cause of their loss was that the depository banks had negligently, recklessly and in at least one case knowingly turned their money over to Carpenter. . . .").

33

proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort." Aetna at 537 (quoting K&S Partnership v. Continental Bank, N.A., 952 F.2d 971, 979 (8th Cir. 1991)). The following factors are relevant in determining whether the assistance was substantial enough to justify imposing liability: (1) the nature of the act encouraged; (2) the amount of assistance given by the defendant; (3) his presence or absence at the time of the tort; (4) his relation to the other; and, (5) his state of mind. Restatement (Second) of Torts §876(b), comment d. The first factor certainly weighs in favor of an aiding and abetting charge. The allegations of fraud against the Plaintiffs involved a premeditated, long standing, and well organized fraud that inflicted substantial harm on a large number of victims.

With regard to the remaining factors, the allegations against Fifth Third, Wachovia, and Sun Trust are that these banks opened accounts for James Carpenter in the name of Serengeti and Lomas, that they processed checks written by Plaintiffs, depositing their proceeds in the above accounts, and that they allowed checks to be written from those same accounts. No other participation or assistance is alleged. Other courts have found that merely allowing a tortfeasor to use a bank account as part of the means of perpetrating a fraud is insufficient to support the element of substantial assistance for an aiding and abetting charge against the bank. See Williams v. Nank Leumi Trust Co., 96 Civ. 6695, 1997 U.S. Dist. LEXIS 7538. *14 (S.D.N.Y. May 30, 1997)(finding no substantial assistance where principal opened several accounts at depositary bank and used accounts to further the principal's fraud).

The Amended Complaint alleges no special relationship between these Depositary Banks and James Carpenter; makes no allegation that any agent of the bank was present when the underlying fraud was perpetrated; and, does not allege any intent on the part of the bank to assist in

the alleged fraud perpetrated by Mr. Carpenter, to harm the plaintiffs, or to profit from the alleged fraud.[37]  Thus, four out of the five factors to be considered in determining whether there is substantial assistance weigh against such a finding as against Fifth Third, Wachovia, and Sun Trust.  Without a finding of substantial assistance, there can be no liability for aiding and abetting.  Therefore, even if it were not barred by the applicable statute of limitations, Count Nine would be dismissed as against Defendants Fifth Third, Wachovia, and Sun Trust.[38]

There are additional factual allegations against Huntington (as successor to FNB).  The Amended Complaint alleges that after discovering that the accounts opened by James Carpenter were suspect, FNB nevertheless allowed Mr. Carpenter to "withdraw the remaining stolen money."  In doing so, Plaintiffs argue that FNB violated a duty to report their findings to various agencies, and facilitated the alleged fraud.  It is possible that, if this claim had been timely filed, these additional allegations of "substantial assistance" could have saved this claim against Huntington from summary dismissal at this stage of the litigation.[39]

---

[37] There is an allegation that they profited by opening and maintaining the accounts at issue, but these profits stemmed only from the banks's ordinary course of business.  There is no allegation that they shared in proceeds from the alleged fraud or otherwise received higher or additional fees because of the alleged fraud.  (Amended Complaint at 19).

[38] The allegations against Huntington Bank also include additional facts that would show a special relationship between the employee who opened the accounts at their predecessor in interest, and James Carpenter.  The employee, Ashley Carpenter is James Carpenter's daughter.  This relationship alters the balance of the factors considered in determining whether there was substantial assistance.  The Court need not decide whether this would otherwise save the aiding and abetting claim from dismissal because, as set forth above,  the claim is untimely, and those claims based solely on vicarious liability for the acts of Ashley Carpenter are barred by the settlement and release in Posen.

[39] Indeed, this was the result in Metz.  Based on the additional allegations against Unizan Bank (the successor to FNB, and predecessor to Huntington), the aiding and abetting claim was allowed to go to trial.

## **CONCLUSION**

For all of the reasons set forth above, the following motions are disposed of as indicated:

\*      Defendant Springs Valley Bank & Trust's Motion to Dismiss (**ECF #90**) is **GRANTED**. All claims against Springs Valley Bank & Trust are dismissed for want of prosecution.

\*      Defendant Huntington National Bank's Motion to Dismiss Amended Complaint is **GRANTED**.  (ECF #120).  Counts One, Two, Six, Seven, Eight, and Nine are dismissed against Huntington National Bank.  There are no remaining claims against Huntington National Bank.

\*      Fifth Third Bank's Motion to Dismiss Second [sic] Amended Complaint is **GRANTED**. (ECF #98).  Counts One, Three, Six, Seven, Eight, and Nine are dismissed against Fifth Third Bank.  There are no remaining claims against Fifth Third.

\*      Sun Trust Bank and Wachovia Bank's Motion to Dismiss is **GRANTED** in part and **DENIED** in part.  (ECF #121). Counts One, Four, Five, Six, Seven, Eight, and Nine are dismissed against Sun Trust Bank and Wachovia Bank.  There are no remaining claims against Sun Trust and Wachovia.

\*      Bank of America's Motion to Dismiss is **GRANTED**.  (ECF #137).  There are no remaining claims against Bank of America.

\*      Farmers & Merchants Bank of Colby's (named as Bank of Colby in the caption of the Amended Complaint) Motion to Dismiss is **GRANTED**.  (ECF #124).  Farmers & Merchants Bank of Colby's (Bank of Colby) is dismissed from this action for lack of personal jurisdiction.

\*      Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, and Sky Bank's Motion to Dismiss Amended Complaint is **GRANTED**.  (ECF # 108).  There are no remaining claims against Belmont National Bank, J.P. Morgan Chase Bank, N.A., Key Bank, PNC Bank National, or Sky Bank.

\*      Century Federal Credit Union's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**.  (ECF #118).  There are no remaining claims against Century Federal Credit Union.

\*      Charter One Bank's Motion to Dismiss Amended Complaint is **GRANTED**.  (ECF #107). There are no remaining claims against Charter One Bank.

\*      Dollar Bank's Motion to Dismiss Plaintiff's First Amended Complaint is **GRANTED**. (ECF #103).  There are no remaining claims against Dollar Bank.

\* First Merit Corporation's Motion to Dismiss is **GRANTED**.  (ECF #95).  There are no remaining claims against First Merit Corporation.

\*  First National Bank of Pennsylvania's Motion is **GRANTED**.  (ECF #136).  There are no remaining claims against First National Bank of Pennsylvania.

\* German American Bancorp's Motion to Dismiss Amended Complaint is **GRANTED**.  (ECF #156).  German American Bancorp is dismissed from this action for lack of personal jurisdiction.

\* Killbuck Savings Bank and U.S. Bank National Association's Motion to Dismiss is **GRANTED**.   (ECF # 96).  There are no remaining claims against Killbuck Savings Bank or U.S. Bank National Association.

\* Old National Bancorp's Motion to Dismiss Plaintiffs' First Amended Complaint is **GRANTED**.  (ECF #87).    There are no remaining claims against Old National Bancorp.

\* Sunflower Bank's Motion to Dismiss the Amended Complaint is **GRANTED**.  (ECF #97).  Sunflower Bank is dismissed from this action for lack of personal jurisdiction.

\* Third Federal Savings Bank's Motion to Dismiss Amended Complaint is **GRANTED.**  (ECF # 99).    There are no remaining claims against Third Federal Savings Bank.

\* Terre Haute Savings' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim is **GRANTED**.  (ECF #84).    Terre Haute Savings is dismissed from this action for lack of personal jurisdiction.

\* Wells Fargo Bank's Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**.  (ECF #101).    There are no remaining claims against Wells Fargo Bank.

\* Wilson & Muir Bank's Amended Motion to Dismiss Plaintiffs' Amended Complaint is **GRANTED**.  (ECF # 89).    Wilson & Muir Bank is dismissed from this action for lack of personal jurisdiction.

Defendants Terre Haute Savings, Wilson & Muir Bank & Trust Co., Sunflower Bank, Farmers &

Merchants Bank of Colby, and German American Bancorp are dismissed for lack of personal

jurisdiction.  As against the remaining banks (except First National Bank and First National Bank

of Odon), Counts One, Six, Seven, and Eight are dismissed as time-barred under the three year

UCC statutes of limitations.  Counts Two through Five, and Count Nine are dismissed as time-

37

barred under O.R.C. §1707.43(B).  In addition, Counts Two through Five fail to state a claim upon which relief can be granted.  Count Nine also fails to state a claim as against Defendants Fifth Third, Wachovia, and Sun Trust banks.  Finally, because Defendants First National Bank and First National Bank of Odon were never served, they are dismissed from this action without prejudice. If the Plaintiffs believe that they can properly serve these Defendants, they may move the Court to reinstate this case as against these Defendants.  **IT IS SO ORDERED.**


    /s/ Donald C. Nugent
DONALD C. NUGENT
United States District Judge


DATED:  June 18, 2009